## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARY MORGAN<br>5429 Parker Street<br>Richmond, VA 23231<br><br>    and<br><br>AMANDA SMITH,<br>13650 Little Patrick Road<br>Amelia Court House, VA 23002<br><br>on behalf of themselves and all others similarly situated,<br><br>               Plaintiffs,<br><br>      v.<br><br>RICHMOND SCHOOL OF HEALTH AND TECHNOLOGY, INC.,<br>9325-C Midlothian Turnpike<br>Richmond, VA 23236<br><br>               Defendant. | Civil Action No.:<br><br>Judge: |

## CLASS ACTION COMPLAINT

### INTRODUCTION

1.     Plaintiffs Mary Morgan and Amanda Smith bring this action for damages, injunctive relief, and declaratory relief on behalf of themselves and all others similarly-situated against Defendant Richmond School of Health and Technology, Inc. to seek redress for violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*; violation of the Virginia Consumer Protection Act, Va. Code Ann. § 59.1-196 *et seq.*; breach of contract; and fraudulent

inducement to contract.  Plaintiffs have been and continue to be injured by a deceptive and dishonest scheme perpetrated by Defendant in the area of post-high school vocational education.

2.      Plaintiffs are or have been enrolled in a for-profit college called "RSHT" that Defendant has owned and operated since 1997.  (Defendant and its college are referred to interchangeably herein as "RSHT".)  The college has also been known as the Richmond School of Health and Technology.  RSHT offers vocational degrees and diplomas for occupations such as surgical technician, medical assistant, massage therapist, and more at campuses in Richmond and Chester, Virginia.  RSHT explicitly states in its "School Catalog" that its "primary purpose . . . is to instruct students to such competency levels that they are qualified for employment and/or advancement in existing or potential occupational fields."  RSHT makes numerous other specific representations to potential students that the education the school provides is adequate and sufficient to allow the students to practice and succeed in their field of study.

3.      RSHT is a sham.  It exists to make money without any regard for the education its students receive in exchange.  The school provides little if any educational value and fails to enhance the occupational qualifications and career prospects of its students.  Among other failings, RSHT does not prepare its students to take and pass certification tests that they must pass to be licensed; does not provide adequate externships to students who require externships for licensing; does not provide adequate equipment to train students properly; and does not always provide teachers for its classes.

4.      RSHT nonetheless charges each student from $10,000 to $20,000 or even more, depending on the program.  RSHT finances its scheme by enrolling almost exclusively students who receive federal financial aid, mostly in the form of student loans from the federal government.  This aid totals more than $5 million a year, which is over 86% of RSHT's revenue.

RSHT plays an extensive role in the financial aid process, including filling out most or all students' federal financial aid forms and gathering and submitting the students' necessary paperwork to the United States Department of Education ("Department of Education").  RSHT works to maximize the aid each student receives from the Department of Education because that is how the school maximizes the number of students who can pay its high tuition.  RSHT treats the Department of Education as its source for cash, with the students serving unwittingly as the means by which RSHT enriches itself at the expense of both the students and the public fisc.

5.     Most students leave RSHT saddled with large debts as a direct result of RSHT's scheme to generate revenue through federal financial aid programs.  Yet they also leave without the prerequisites and knowledge to obtain a license and/or a job in their field of study, even though that it is what RSHT contracts to give them in return for their tuition.  The students therefore also leave RSHT without any increased earning capacity or the ability to manage the large debts they incur because of RSHT.  This often leads to students defaulting on their student loans, which destroys their credit ratings and impairs their ability to get credit and to pass workplace background checks for years into the future.  RSHT does well in earning money off its students, but it earns an "F" in serving their educational interests because it is concerned only with profit, not education.

6.     Defendant is engaged in a pattern or practice of specifically and intentionally targeting this unlawful scheme at African Americans by focusing RSHT's marketing and outreach at channels that disproportionately reach an African-American audience.  This includes, but is not limited to, advertising on the BET (Black Entertainment Television) cable channel and Richmond hip hop radio stations 92.1 FM and 106.5 FM.  RSHT's advertising emphasizes that RSHT is located "on the bus line."  This is a euphemism that RSHT uses intentionally to portray

itself as a school for African Americans and to target African-American communities that rely disproportionately on Richmond's public transportation system.

7.       RSHT similarly targets residents of poorer neighborhoods in the Richmond area.

8.       As a direct result of RSHT's pattern or practice of deliberately targeting its programs on the basis of race and at poorer neighborhoods, RSHT's student body is disproportionately African-American.  African Americans constitute 75% of all RSHT students, even though the Richmond metropolitan area is only 30.1% African-American.  A comparable disparity remains even after limiting the population to people over 25 years old with a high school diploma or GED certificate but no subsequent degree (*i.e.*, people more likely to be interested in for-profit vocational colleges).  Only 33.8% of this population in the Richmond metropolitan area is African-American.

9.       Targeting African Americans to take out loans on the basis of deceptive and otherwise unfair practices constitutes "reverse redlining."  Reverse redlining has repeatedly been held to violate federal anti-discrimination laws, including the Equal Credit Opportunity Act.  The disparate impact of RSHT's pattern or practice of targeting poorer neighborhoods likewise violates the Equal Credit Opportunity Act.

10.      Plaintiff Mary Morgan is African-American and paid over $10,000 to attend RSHT's Community Home Health ("CHH") program from January 2010 to October 2010.  Morgan paid for most of this cost with federal student loans and smaller Pell Grants, all arranged for her by RSHT.  RSHT represented to Morgan that, among other things, attending RSHT would give her an education that would make her eligible for a license in community home health and that this credential would be "higher" than the Certified Nurse Aide ("CNA") license Morgan had previously held.  No such certification in community home health exists in Virginia,

however.  Morgan enrolled at RSHT on the basis of RSHT's representations about the CHH program.

11.     The curriculum that RSHT used for Morgan's program did not prepare her for any certification examination.  In addition, among other deficiencies, the school did not even provide proper and sufficient books and laboratory materials for the students to work with, such as hospital beds and patient dummies.

12.     The CHH program was so inadequate that, shortly after Morgan graduated, RSHT agreed to pay for Morgan and the other CHH students to attend a six-week Certified Nurse Aide Training Program at a different for-profit school in Richmond.  The other school's course cost approximately $900 and was meant to prepare students to take the CNA examination.

13.     Morgan attended the other school's class and took and passed the CNA exam. This left Morgan with the same credential she previously held after spending over $10,000 and nine months on an education that RSHT promised would give her a higher and more valuable credential then she held before.  For more than $10,000, the only purported benefit Morgan received in the end was a six-week refresher course from another school valued at $900.

14.     Plaintiff Amanda Smith, who is white, learned about RSHT's Surgical Technology ("ST") program from an African-American co-worker.  Smith was living in a predominantly African-American part of Richmond at the time.  She started the program in August 2008 and graduated in March 2010.  Smith received $20,000 in federal financial aid arranged by RSHT, all in the form of student loans, to pay RSHT's tuition.  Smith enrolled in the program because RSHT promised her that the education would give her all of the knowledge and prerequisites she needed to become a licensed surgical technician.  The licensing requirements

include passing a written certification examination and a specified amount of surgical

experience, which RSHT students are supposed to get through externships arranged by RSHT.

15.     The education Smith received at RSHT was not remotely sufficient to prepare her

for the written exam.  She was only able to pass through self-study unassisted by the school and

with tutoring from her fiancé, who is a surgical nurse.

16.     Nor did RSHT arrange adequate externships for Smith.  She was instead given

three externships that did not include any surgical experience.  At one point, Smith even

arranged on her own for an appropriate externship with a surgical center, but RSHT needed to

call the center to formalize the externship and refused to do so.  Because she lacks the required

surgical experience, Smith cannot get her license as a surgical technician.

17.     Smith has tried to get a surgical externship on her own since graduating, but

hospitals and surgical centers will not give her one because of liability concerns since she is no

longer attending an educational institution.  Smith has applied for many jobs as a surgical

technician but cannot secure one because she cannot get her license.

18.     As a direct result of RSHT's deceptive and unlawful practices, Morgan and Smith

now have significant student loans and lack the resources to repay them.  They are in the same

jobs they were in before they enrolled at RSHT and lack any real prospects of obtaining the

kinds of jobs that RSHT told them they would be eligible for if they attended RSHT.  RSHT has

acted unlawfully by exploiting Morgan and Smith, and many other students, to enrich itself with

taxpayer-funded federal financial aid dollars while providing virtually nothing in return.

**PARTIES**

19.     Plaintiff Mary Morgan was a student in the Community Home Health program at

RSHT from January 2010 to October 2010.  Morgan is a resident of Richmond, Virginia, and has

been at all times relevant to the allegations set forth herein.  Morgan is African-American and 49 years old.

20.     Plaintiff Amanda Smith was a student in the Surgical Technology program at RSHT from August 2008 to March 2010.  Smith was a resident of an area of Richmond, Virginia, that is predominantly African-American when she enrolled at and attended RSHT.  She is now a resident of Amelia Court House, Virginia.  Smith is white and 28 years old.

21.     Defendant Richmond School of Health and Technology, Inc. is a Virginia corporation that was formed in 1997.  Richmond School of Health and Technology, Inc. has owned and operated RSHT since 1997, including under the names "Richmond School of Health and Technology" and "RSHT Training Center."  Richmond School of Health and Technology, Inc. maintains two RSHT campuses, which are located in Virginia at 1601 Willow Lawn Drive in Richmond and at 751 West Hundred Road in Chester.  Richmond School of Health and Technology, Inc. maintains a corporate office at 9325-C Midlothian Turnpike in Richmond. Richmond School of Health and Technology, Inc. is deemed to reside in Washington, D.C. under 28 U.S.C. § 1391(c).

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this matter pursuant to 15 U.S.C. § 1691e(f), 28 U.S.C. § 1331, and 28 U.S.C. § 1343.

23.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1) and (2).

## FACTUAL BACKGROUND

**1.     For-Profit Colleges Have Grown Dramatically, Rely Heavily on Federal Financial Aid, and Pose a Significant Problem of Fraud and Abuse**

24.     RSHT is one of approximately 2000 for-profit colleges in the country where students who attend are eligible to receive federal financial aid through the United States

Department of Education under Title IV of the Higher Education Act of 1965.  These schools, also known as "proprietary institutions of higher education," are required by federal law to "prepare students for gainful employment in a recognized occupation."  34 C.F.R. § 600.5.

25.     For-profit colleges offer a wide array of programs.  Many offer diplomas and associate's degrees in vocational areas like medical billing, cosmetology, massage therapy, web page design, and numerous other areas.  Programs frequently require enrollment for one to two years.

26.     In recent years the number of students attending for-profit colleges has been increasing faster than the number in traditional public and non-profit colleges and universities.  For-profit colleges now enroll approximately 12% of the nation's higher education students.  Students at for-profit colleges are disproportionately older and drawn from lower income backgrounds than students at traditional public and non-profit colleges and universities.

27.     Federal financial aid programs under Title IV have been a critical component of the rapid growth of for-profit colleges.  Title IV programs include, among others, the Direct Loan Program, Stafford Loans, and the Pell Grant Program.  Federal financial aid to for-profit colleges under these programs totaled approximately $24 billion in the 2008/2009 academic year (July 1, 2008 to June 30, 2009).  Approximately 80% of this was in the form of loans and 20% in the form of Pell Grants.

28.     Under the federal Title IV loan programs, students receive loans for their education directly from the United States.[1]  The school receives the loan proceeds and typically credits them to the student's account to pay for tuition and other charges.  Students must repay these loans including applicable interest.  Pell Grants are need-based grants to students that do

---

[1]      For some borrowers before June 30, 2010, these loans came from private lenders but were guaranteed and subsidized by the United States under Title IV's Federal Family Education Loan Program.  RSHT students' loans have come directly from the United States since at least the 1999/2000 academic year.

not have to be repaid. Most Pell Grants are awarded to students from families with an annual

income below $30,000. In the 2008/2009 academic year, individual Pell Grants ranged from

$523 to $4,761. The maximum annual Pell Grant a student may receive is currently $5,550.

29.     For many years there have been concerns about extensive fraud and abuse

committed by for-profit schools that take advantage of federal financial aid programs without

giving students a useful education in return. As the Congressional Research Service explained:

> During the late 1980s and into the 1990s, the General Accounting Office (GAO),
> Congress, and Office of the Inspector General (IG) at the U.S. Department of
> Education conducted investigations of student aid programs and found evidence
> of extensive fraud and abuse; some of the worst examples of these practices were
> found at proprietary schools. . . . When default rates peaked nationwide in 1990,
> default rates at proprietary schools reached 41% compared with an overall default
> rate of 22%. Many proprietary schools were failing to provide students with a
> quality education or training in occupations with job openings, focusing instead
> on obtaining federal student aid dollars. As a result, students left proprietary
> institutions with no new job skills or few prospects of employment in their field of
> study and burdened with substantial loan debt. . . . [P]roprietary institutions that
> were overly dependent on Title IV revenue were considered institutions that were
> not providing a high quality education, and institutions that might be misusing
> federal dollars.

Congressional Research Service, *Institutional Eligibility & the Higher Education Act:*

*Legislative History of the 90/10 Rule and Its Current Status* (updated Jan. 19, 2005), at 3-4

(available at http://www.policyarchive.org/handle/10207/bitstreams/1904.pdf).

30.     In 1992 these concerns led Congress to require for-profit colleges to derive a

minimum percentage of their revenue from non-Title IV sources. The current version of this rule

is commonly referred to as the "90/10 rule" because the schools must derive at least 10% of their

revenue from non-Title IV sources. *Id.*

31.     The new rule did not make the problem of fraud and abuse at for-profit colleges

go away. To the contrary, the problem has grown as the number of students and the amount of

federal financial aid going to these schools has grown. The GAO recently studied a sample of 15

for-profit colleges (identified in part by focusing on schools that barely satisfied the 90/10 rule)

and summarized key findings as follows:

> Undercover tests at 15 for-profit colleges found that 4 colleges encouraged fraudulent practices and that all 15 made deceptive or otherwise questionable statements to GAO's undercover applicants.  Four undercover applicants were encouraged by college personnel to falsify their financial aid forms to qualify for federal aid—for example, one admissions representative told an applicant to fraudulently remove $250,000 in savings.  Other college representatives exaggerated undercover applicants' potential salary after graduation and failed to provide clear information about the college's program duration, costs, or graduation rate despite federal regulations requiring them to do so. . . .

> Programs at the for-profit colleges GAO tested cost substantially more for associate's degrees and certificates than comparable degrees and certificates at public colleges nearby.  A student interested in a massage therapy certificate costing $14,000 at a for-profit college was told that the program was a good value.  However the same certificate from a local community college cost $520.

*For-Profit Colleges – Undercover Testing Finds Colleges Encouraged Fraud and Engaged in Deceptive and Questionable Marketing Practices:  Testimony Before the S. Comm. on Health, Educ., Labor, & Pensions* (Aug. 4, 2010) (statement of Gregory D. Kutz, Managing Director Forensic Audits & Special Investigations) (available at http://www.gao.gov/new.items/ d10948t.pdf).

32.     Fraud and abuse by for-profit colleges and their frequent failure to provide an education remotely commensurate with their promises to students and their high tuition bills remains a subject of great concern in Congress and throughout the country.  Although some of these schools may provide a useful and fairly-priced educational service, many more are leaving students with nothing to show from their "education" but debt from federal student loans.

**2.     RSHT**

    **A.     RSHT's Programs and High Tuition**

33.    According to data submitted by RSHT to the federal government and published

by the Department of Education's National Center for Education Statistics ("NCES"), over 650

students attend RSHT.  Seventy-five percent of the students are African-American and 67% are

at least 25 years old.[2]  The student population of each campus (Richmond and Chester) is

majority African-American, even though the Chester campus is not in a majority African-

American area.

34.    The programs offered by RSHT have varied since its founding.  RSHT's website

currently states that it offers programs in the following areas:

        Community Home Health Care
        Practical Nursing
        Medical Assistant
        Surgical Technology
        Pharmacy Technician
        Massage Therapy
        Medical Billing and Coding
        Radiologic Technology

RSHT admissions officers are given quotas for each of the school's programs.  The admissions

officers steer prospective students toward the programs where RSHT is behind on its quota

without regard to the prospective students' interests.

35.    The NCES data show that RSHT's programs range in cost from $10,140

(Pharmacy Technician) to $28,152 (Radiologic Technology).  They range in duration from 9

months (Pharmacy Technician) to 19 months (Surgical Technology).

36.    The tuition for RSHT is stated in a written contract that each student and a

representative of the school signs.  This contract is called the "RSHT Enrollment Agreement."  It

---

[2]    NCES data on RSHT is available at http://nces.ed.gov/collegenavigator/?id=437769.

commits the student to enrollment in a particular program and to paying the tuition for the entire

program (not just for the first academic term, or "module" as each term is called at RSHT).  The

contract also sets forth how much additional money the student will have to pay if the student

has to repeat a clinical externship.

      **B.**     **RSHT and Federal Financial Aid**

     37.     RSHT is exceptionally dependent on federal financial aid programs.  In the

2008/2009 academic year (the most recent year for which 90/10 data has been published), RSHT

obtained $5,340,486 in revenue from federal Title IV financial aid programs.  This constituted

86.37% of its revenue for the year.  In the 2008/2009 academic year, only 14.3% of the schools

subject to the 90/10 rule nationally derived over 85% of their revenue from federal Title IV

financial aid programs.

     38.     The vast majority of RSHT students receive both Pell Grants and student loans

from the federal government.  Some students also receive additional aid from federal Veterans

benefits and state job retraining programs.

     39.     RSHT maintains a financial aid office on each campus.  Through these offices,

RSHT – instead of its students – plays the dominant role in arranging for the extension, renewal,

and continuation of the federal student loans received by the students.  For example, RSHT

completes the federal FAFSA (Free Application for Federal Student Aid), the key form which

each student seeking federal financial aid must submit to the federal government.  The students

typically go directly to RSHT to apply for their federal student loans and other federal aid.  The

students typically do not go directly to the federal government.

     40.     RSHT commits fraudulent and dishonest acts in obtaining federal student loans

for its students.  It has cut and pasted students' signatures from other documents onto financial

aid forms that are submitted to the federal government.  It has altered W-2 forms to misrepresent information regarding students' income and instructed employees to destroy the documents from which the signatures were cut.  It misleads students into believing that they are getting federal grants when they are really getting loans.  After filling out the FAFSA for students, it instructs the students to review only the portion of the form that includes information like their name and address, but not their income and other financial information.  RSHT took advantage of one student who the lacked legal capacity to contract because of a mental disability by having her sign forms taking out federal student loans without her representative present.  This student did not understand that she was borrowing money to pay RSHT.

41.     RSHT frequently interrupts students in the middle of class to sign financial aid forms, thereby preventing the students from having adequate time to review what they are signing.  RSHT does not explain sufficiently the terms of the student loans to its students, even though it is obligated to do so under federal law governing Title IV financial aid.  RSHT instead pushes its students to sign the necessary paperwork as quickly as possible without understanding the significant debts they are taking on.

42.     Upon information and belief, RSHT asserts such a high degree of control over the federal financial aid process and intentionally manipulates the process in inappropriate ways because federal financial aid is essential to its existence.

43.     RSHT communicates with and provides documentation to the Department of Education, including, upon information and belief, the Department of Education's Financial Management Operations office in Washington, D.C., for the specific purpose of gaining pecuniary benefit by obtaining the federal financial aid funds that allow its students to pay RSHT's tuition.  The funds are transferred from the federal government directly to RSHT.

RSHT could not maintain its educational scheme and business without its contacts with the Department of Education, including, upon information and belief, the Financial Management Operations office in Washington, D.C.

44.     In addition to the fraudulent and dishonest acts identified above regarding financial aid practices, RSHT commits similarly fraudulent and dishonest acts in additional areas.  RSHT alters unfavorable evaluation forms that students complete about the school and changes students' attendance records and grades.  It requests students' high school transcripts after students graduate instead of before they start classes and forges students' signatures on high school transcript request forms.  It falsifies information about graduates' employment status. Many of RSHT's fraudulent and dishonest acts concerning these types of records are committed in anticipation of regulatory audits and with respect to documents that the school must submit to regulatory authorities.  Upon information and belief, these acts are committed by RSHT for the express purpose of preserving the school's accreditation status.  Without proper accreditation, RSHT would not be eligible to offer federal financial aid to its students.

45.     Money is so much RSHT's single-minded focus that it demands monthly payments on the small portion of tuition that is not covered by financial aid even when a monthly payment has been prepaid.  This monthly payment is commonly in the range of $40.  If a student prepays a month or two, RSHT accepts the extra money but nonetheless requires a new payment each month.  This is a significant financial burden for some students.

### C.     RSHT Fails to Fulfill Its Promise and Obligation to Provide an Adequate Education and Prepare Its Students for Employment in Their Field of Study

46.     To induce enrollment at RSHT, RSHT tells prospective students, among other things, that the school will provide an appropriate education.  RSHT tells prospective students that the education for which they pay steep tuition will prepare them to pass certification

examinations required for licensing in their field of study.  RSHT also tells prospective students

that the school will provide appropriate externships where externships are required for licensing.

RSHT's contractual relationship with its students implicitly obligates it to make a good faith

effort to live up to its representations and provide an appropriate education.

47.     RSHT, through employees in its admissions and financial aid offices among

others, makes these representations to prospective students to induce them to enroll in RSHT

programs.   RSHT's representations to prospective students are knowingly false.

48.     RSHT does not fulfill its promises and obligations to the students who enroll.

49.     One critical way in which RSHT fails to fulfill its promises and obligations is that

the school does not prepare students to satisfy licensing requirements.  To practice in the fields

that RSHT purports to prepare students to enter, individuals must obtain a license from a state or

independent body.  Obtaining the license requires, among other things, passing a certification

examination offered by an independent organization not affiliated with RSHT, such as the

National Center for Competency Testing.  RSHT represents to prospective students that it will

provide an education that adequately prepares them to pass these examinations.  These

representations are knowingly false.

50.     The curriculum utilized by RSHT does not prepare students to pass the

examinations required for licensing in their field of study.  The education that students receive at

RSHT commonly does not cover major components of the licensing examinations.  Students

regularly sit for the examinations and find that the examinations bear little relationship to their

course of study at RSHT.  Because the curriculum at RSHT does not prepare them for the

mandatory examinations, students are left to try to educate themselves independently.

51.     As a direct result, RSHT students routinely do not pass the examinations or pass only because of their own efforts independent of RSHT.  If RSHT designed its curriculum to prepare students to take the examinations, consistent with its representations to prospective students, the students' passage rate would be much higher.

52.     In addition to passing a certification examination, a prerequisite for a license in some of the fields that RSHT purports to prepare students to enter is completion of a specified type of clinical externship.  For example, students in the Surgical Technology program must complete an externship at a hospital or surgical center during which they act in the "scrub" or "circulator" role on a surgical team for 150 surgical procedures.  RSHT represents to prospective students that it arranges for the necessary externships as part of the school's curriculum.

53.     RSHT's representations about externships are knowingly false.  When RSHT makes these representations, it knows both that it does not arrange appropriate externships and that its failure to do so prevents the school's graduates from obtaining jobs in their field of study.

54.     In truth, RSHT arranges very few appropriate externships.  RSHT lacks the necessary relationships with area health care providers like hospitals to arrange the externships for its students.  Upon information and belief, many area health care providers do not want RSHT students as externs because of RSHT's reputation for poorly preparing and educating its students.

55.     Even when externships are arranged, they frequently do not satisfy the mandatory criteria established by the licensing authorities.  For example, Surgical Technology students for whom RSHT arranges externships are frequently placed in a hospital division known as "central sterile" where they merely sterilize and pack instruments.  These students do not obtain the required surgical experience in their externships.

16

56.     RSHT frequently continues to promise its enrolled students who require an externship that the school will obtain one for them prior to the completion of their studies at RSHT.  These promises are knowingly false because RSHT lacks the capacity and intent to obtain adequate externships for its students.  Upon information and belief, these misrepresentations are intended to induce students to remain at RSHT and to continue to seek additional federal student aid to pay RSHT for remaining classes.

57.     After students complete their studies at RSHT, they have little if any chance of arranging an externship on their own.  Area health care facilities do not want to give externships to former students who are no longer affiliated with a school because of liability concerns.  They also do not want to give externships to former students because of RSHT's poor reputation.  The former students are left with little if any realistic opportunity to satisfy the externship prerequisite for licensing in their fields of study.

58.     RSHT students from the Community Home Health program cannot obtain the credential that RSHT told them the program would lead to for another reason – the credential does not exist.  RSHT falsely promised prospective students that the CHH program would make them eligible for a license in community home health, but there is no such thing in Virginia.  RSHT knew that the license did not exist when it made this promise to prospective students who later enrolled in the CHH program.  RSHT also falsely promised prospective students that they would learn how to start and manage their own home health care business, but the CHH curriculum included no such information.  RSHT no longer offers the CHH program even though it is still listed on the school's website.

59.     At or around the conclusion of the CHH program – which cost over $10,000 – RSHT finally admitted to its students that it did not know what certification examination fit the

CHH curriculum.  RSHT eventually paid for the CHH students to enroll in a six-week, course that cost approximately $900, was offered by a different for-profit school, and prepares students for the Certified Nurse Aide examination.  In the end, all the students gained for more than $10,000 was a credential that they could have gained for $900.  RSHT did not return any of the students' tuition dollars.

60.     Another way in which RSHT enriches itself at its students' expense is by failing to provide proper medical tools for use by students who must be trained to handle medical tools. Students in the Surgical Technology program have resorted to making photocopies of pictures of surgical instruments and bringing them to class to share with other students in a desperate attempt to gain some semblance of the knowledge that RSHT is obligated to teach them.  Even when teachers have requested basic supplies, RSHT has refused to supply them.  Some students accept externships in central sterile, even though the externship will not satisfy the licensing requirement, because being in central sterile at least gives them an opportunity to handle the surgical instruments that RSHT should provide in the classroom but does not.  Similarly, when RSHT provides books to students, they are frequently out of date and therefore of limited usefulness.

61.     RSHT students also suffer educationally because RSHT often changes their teacher in the middle of an academic term.  RSHT students frequently come to class to find that their teacher has been replaced by a new teacher.  This sometimes happens multiple times in the same class in a term.  In some cases, the old teacher is gone but no replacement teacher has been assigned to the class, and the students are left with no teacher for multiple class sessions. Students have been left for weeks at a time going to classes where there is no teacher.  RSHT saves money but the students gain nothing.

62.     RSHT students also suffer educationally because RSHT does not assign them to the appropriate classes.  RSHT enrolls students throughout the year regardless of what classes it is currently offering and how those classes fit into the curriculum.  For example, RSHT has had students take Anatomy II before Anatomy I, even though Anatomy II requires knowledge from Anatomy I.  This practice allows RSHT to enroll and begin receiving money from students sooner than if RSHT waited to enroll the student until it was offering the entry level class.  The practice does not benefit the students educationally.  To the contrary, practices like this minimize any benefit students gain from attending RSHT.

63.     RSHT also maximizes its income at the expense of students by manipulating classroom results to keep students in its programs who are not succeeding.  The student body at RSHT, like any school, includes some students who are not passing or attending their classes. RSHT does not want these students to fail out or drop out because RSHT would then not receive any more financial aid dollars for them.  School administrators therefore change students' grades and attendance records to reflect better results than the students are actually achieving, which allows RSHT to keep them enrolled in school.  For the same reason, administrators tell teachers who want to give accurate grades to failing students that they must instead do whatever needs to be done to give passing grades to those students.  Similarly, and over the objections of teachers, school administrators coach students with the correct answers to test questions so that they will pass.  These practices cause students who are not succeeding and who should and would otherwise leave RSHT without incurring any more debt to instead remain at the school and take out more student loans, solely for the financial benefit of RSHT.

64.     RSHT also sacrifices its students' education to enrich itself by refusing to let students attend class if they do not make their small monthly out-of-pocket payments on time.

Even if the late payment is only $40, RSHT tells its students that they cannot go to class until they pay.

65.     The practices identified herein reflect only some of the many deceptive, dishonest, and unlawful practices engaged in by RSHT to enrich itself at the expense of its students, who receive little if any educational value in exchange for the money they pay and the debts they incur, and at the expense of the federal government.

3.     **EXPERIENCES OF THE NAMED PLAINTIFFS AT RSHT**

  **A.     Plaintiff Mary Morgan**

66.     Plaintiff Mary Morgan learned about RSHT from an advertisement in the summer of 2009.  At the time, she was working as a housekeeper for the Virginia Commonwealth University Health System.  Morgan had previously held a license as a Certified Nurse Aide (CNA).

67.     Morgan went to RSHT late in the summer of 2009 to learn about RSHT's Community Home Health ("CHH") program.  She met with Deborah Alexander, an admissions officer at RSHT's Richmond campus.  Alexander told Morgan that the certification she would obtain by taking RSHT's CHH program would be a "higher" credential than the CNA certification that Morgan previously held.

68.     Alexander also told Morgan that the CHH program would teach and enable Morgan to start and run her own home health care business.

69.     Alexander told Morgan that the CHH program would give Morgan a "great" education for the money and that the program would boost Morgan's earning capacity by allowing her to obtain a better paying job in home health care than her current job and by allowing her to start her own home health care business.  Alexander told Morgan that Morgan

would benefit from RSHT's career development resources, including a job placement program ensuring that students find employment upon graduation from RSHT.

70.     Alexander also told Morgan that Morgan would not have to give up her full-time day job to attend RSHT's CHH program because RSHT offered classes at night, and that financial aid would help Morgan to pay the tuition of approximately $10,260 for the nine-month CHH program.

71.     Morgan left her meeting with Alexander very interested in and excited about attending RSHT's CHH program because of Alexander's representations.

72.     Morgan met with RSHT again in November 2009.  This time she met with Alexander and Jennifer Glover, a RSHT financial aid officer.

73.     Alexander and Glover both knew that Morgan had previously held a CNA license. Both told Morgan that the certification she would obtain by attending RSHT's CHH program would result in a "higher" licensing credential.

74.     When Morgan expressed concerns to Glover about the cost of the CHH program, Glover told her that completing the CHH program would allow her to get out of housekeeping and into a position as a health care practitioner, and that this would boost her income.

75.     On the basis of RSHT's representations regarding the CHH program, Morgan enrolled on or about November 20, 2009, by signing a written Enrollment Agreement, which a representative of RSHT also signed.  When Morgan enrolled in November, classes were supposed to begin in December.  RSHT later told Morgan that classes had to be delayed until January because the CHH program was not ready.

76.     Glover and Alexander pressured Morgan to complete her enrollment quickly to avoid losing her place in the CHH program.  When Morgan began the CHH classes in January

2010, however, there were only a few other students in the program and her classes were far from full.

77.     Prior to beginning classes, Glover asked Morgan to provide information about her current income, but not any other financial information, for financial aid purposes.  Morgan did not fill out a FAFSA.  Instead, RSHT used the information provided by Morgan to complete a FAFSA for Morgan to sign.  Morgan did not submit her financial aid forms to the Department of Education herself.  Instead, RSHT submitted the forms.

78.     Morgan received over $9,000 in federal student loans, all of which was used to pay RSHT for tuition.  Glover did not explain Morgan's financial aid package to her or give Morgan ample time to ask questions about the loans that she was taking out.  At Glover's request, Morgan accepted the loans even though she did not understand how long she would have to pay them back, when the repayment period would begin, and other important information about the loans.  In addition to paying RSHT with the proceeds from her federal loans, RSHT also required Morgan to pay $40 to RSHT every month to cover the difference between the financial aid she received and the cost of the CHH program.

79.     When school started and throughout her enrollment at RSHT, RSHT did not provide Morgan and her classmates the necessary and appropriate resources for a proper education.  This included books and laboratory materials.  Although hands-on experience was supposed to be an integral part of the CHH curriculum, the students rarely had access to a lab where they could practice basic caretaking skills using hospital beds and dummies.  The CHH curriculum also did not include any components related to starting or operating a home health care business.

80.     RSHT frequently disrupted Morgan's classes by adding new students.  When new students enrolled in the CHH program, RSHT added them to the current classes without regard to how long ago the classes had started.  The constant influx of new students disrupted classroom progress and students' ability to learn the course material.  RSHT's lack of organization and resources persisted throughout Morgan's time as a student at RSHT.

81.     When she enrolled in the program, Morgan was promised an externship as part of the CHH curriculum that would give her valuable hands-on experience.  The externship that RSHT arranged required her to drive 40 minutes each way to the Petersburg, Virginia area every day for six weeks.  This interfered significantly with Morgan's work schedule.  It also required Morgan to devote a substantial amount of time and money to completing the externship, which was an unexpected and heavy burden.

82.     The quality of Morgan's externship was poor.  The purpose of the externship was to provide practical experience to CHH students, but Morgan's externship provided her with almost no opportunities for hands-on learning.  Morgan merely observed employees of the host organization as they fed, bathed, and otherwise cared for clients.  She did not gain hands-on experience with these tasks herself.

83.     When Morgan had nearly completed RSHT's CHH program in the fall of 2010, she discovered that there was no state certification in "community home health," and that RSHT did not know what certification examination she and the other CHH students would take.  Melanie Chewning, a senior RSHT employee, frequently told Morgan in August and September 2010 that she was "not sure" what the CHH students would be able to become certified in.

84.     In October 2010, after Morgan had graduated from the CHH program, Chewning told Morgan that she and the other CHH students would sit for the Patient Care Technician

("PCT") exam.  Morgan was upset by this news.  RSHT had promised her certification in community home health and told her it would be a "higher" certification that the CNA license Morgan had previously held.  A PCT license, however, is a lesser qualification than CNA.

85.     RSHT chose to have Morgan and its other CHH students sit for the PCT examination even though the CHH curriculum did not teach students the material tested on the PCT exam.  For example, skills related to taking blood and EKG tests are on the PCT exam but are not covered in the CHH program.  As arranged by RSHT, Morgan took the PCT exam in November 2010.  Because the CHH program was not designed to prepare students for the PCT exam, Morgan did not pass.

86.     Morgan and other students were very upset with how RSHT handled the CHH program and their certification examination.  As a result of their continued complaints, RSHT enrolled the CHH students in a six-week Certified Nurse Aide Training Program at another for-profit school in Richmond, the Professional Career Institute ("PCI").  The PCI course cost approximately $900 and was designed to prepare students to take the CNA licensing exam. RSHT paid the $900 tuition but did not refund the CHH students any of the more than $10,000 each had paid to RSHT for the CHH program.

87.     Morgan completed the PCI course but could not take the corresponding CNA exam right away because RSHT would not pay the $96 exam fee, even though Chewning had told Morgan that RSHT would pay for it.  Morgan had to save enough money to take the test, which she did.  Morgan passed the CNA exam in May 2011.

88.     Although Morgan paid over $10,000 for and devoted nine months to the CHH program at RSHT, she has ended up with a credential in the very same area – CNA – that she previously held and which required only $900 and six weeks of refresher classes.  RSHT induced

Morgan to enroll in the CHH program by promising a greater credential but failed entirely to provide an education commensurate with that promise.

89.     RSHT's promises regarding career development and job placement services have also gone unfulfilled and Morgan has received only minimal assistance.

90.     Morgan spent over $10,000, mostly through debt, for a program that did not remotely provide the education and licensing eligibility promised by RSHT.  Morgan reasonably believed RSHT's promises, but RSHT did not make a good faith effort to fulfill them.  Morgan's loans have now entered repayment but she is in the same job as she was before enrolling at RSHT and does not have the credentials to move into the type of higher-paying healthcare job that RHST was supposed to provide.  Morgan is therefore struggling financially and lacks the resources to repay her student loans.

91.     Morgan's experience as a prospective student and student at RSHT are typical of the experiences of others who have enrolled at RSHT.

### B.     Plaintiff Amanda Smith

92.     Plaintiff Amanda Smith learned about RSHT and its Surgical Technology ("ST") program from an African-American co-worker at St. Mary's Hospital.  Smith was working, and continues to work, full-time at St. Mary's as a pathology technician.  Smith was living in a predominantly African-American part of Richmond when she learned about RSHT.

93.     Smith phoned RSHT in June 2008 to learn more about the ST program.  On June 26, 2008, she met with Daphne Patterson, an RSHT admissions officer.  Patterson told Smith that RSHT's ST program would give Smith everything she needed to become licensed as a surgical technician.  Patterson stated that the program would include three five-week externships arranged by RSHT in hospitals and/or surgical centers where Smith would obtain operating room

experience.  Licensing as a surgical technician requires passing a written examination and a

minimum level of operating room experience.  RSHT represented to Smith through January 2010

that the school would provide her with the necessary operating room externships.

94.     Patterson also told Smith that the tuition at RSHT would cover the cost of her

certification exam.

95.     Patterson told Smith that finding a job at the completion of the program would be

easy because RSHT would provide extensive job placement and career development services.

Patterson also promised Smith that she would be able to earn more money by taking RSHT's ST

program.

96.     Patterson told Smith that because the ST program offered night classes, Smith

would be able to keep her full-time job.

97.     Patterson pressured Smith to enroll in RSHT's ST program right away.  On the

basis of RHST's representations regarding the ST program, Smith enrolled on or about June 26,

2008.  She signed a written Enrollment Agreement, which a representative of RSHT also signed.

98.     Smith returned to RSHT approximately a month later and met with Jennifer

Glover, the same financial aid officer who Plaintiff Mary Morgan met with.  Glover had already

completed a FAFSA for Smith and asked Smith to review the FAFSA to verify only her birth

date and other personal information, but not her financial information.  Smith did not submit her

financial aid forms to the Department of Education herself.  Instead, RSHT submitted the forms.

99.     Smith received approximately $20,000 in federal financial aid, all of which was

used to pay RSHT for tuition.  All of the financial aid was in the form of student loans.  RSHT

did not explain to Smith anything about the terms of the loans, but Glover told Smith that her

monthly payment would be under $100 when she had to start paying the loans back.  When

Smith had to start paying her loans back in October 2010, however, the monthly payment was approximately $200.

100.      Smith started classes at RSHT in the ST program in August 2008.  When school started and throughout her enrollment at RSHT, RSHT did not provide Smith and her classmates the necessary and appropriate resources for a proper education.  Among other things, to become surgical technicians students must master numerous instruments used during surgery.  The school did not have nearly enough instruments for the students to use, however.  Students must also, among other things, learn how to put on gowns and gloves in a manner that prevents contamination.  Yet often there were no gowns or gloves for students to use in the lab, preventing them from learning this fundamental skill.

101.      RSHT also failed to provide adequate instruction in the ST courses.  For example, when Smith began the mandatory five-week Body Structure and Function class, Mark Russel, an RSHT dean, told Smith and her classmates that they did not have an instructor.  Classes were scheduled from 5:30 to 10:30 p.m. four days a week.  Russel attended the first thirty minutes each day and assigned students chapters to read and homework to complete.  Russel would read the correct answers to the homework from the answer key, but the students did not receive any actual instruction in the course material from Russel or anybody else.  Smith was left to learn the material on her own.

102.      New students were continually added to the ST program while Smith was enrolled at RSHT, which significantly impaired students' ability to learn the course material.  RSHT placed new students in courses that were currently being taught without regard to the level of the course and whether it was supposed to be preceded by a more basic course.  This prevented students from obtaining basic knowledge and then building on that knowledge to master more

advanced material.  Smith was frequently required to take more advanced courses before she completed the corresponding introductory level courses.  This practice greatly interfered with Smith's ability to learn the course material.

103.    The externship opportunities made available to Smith by RSHT were also deficient and far from what Patterson had represented in persuading Smith to enroll at RSHT.

104.    Smith heard rumors in May 2009 that RSHT was not obtaining appropriate operating room externships for all of the ST students.  Smith therefore took it upon herself to contact a surgery center and try to arrange an externship on her own.  Smith was successful.  She found a surgery center that agreed to give her an externship with the operating room experience she would need for licensing as a surgical technician after graduation, but the center told Smith that RSHT would have to contact it to arrange the externship formally.  Smith gave the necessary contact and other information to RSHT's externship coordinator, Dr. Calvin Brown, in June 2009.  Brown refused to make the necessary phone call despite repeated entreaties by Smith. Smith was therefore not able to do the externship.  Months later, Smith confirmed with the surgical center that nobody from RSHT ever contacted them about Smith doing an externship.

105.    In October 2009, RSHT scheduled Smith to begin her first five-week externship. Brown notified Smith that she had been placed with Stony Point Surgery Center.  When Smith arrived for the first day of the externship, however, no one was expecting her.  The woman who RSHT told Smith to ask for at Stony Point said that the surgery center had no affiliation or contract with RSHT, and that she had no idea why Smith was there.

106.    Smith immediately contacted RSHT's new externship coordinator, Dana Johnson. Johnson told Smith that she had been sent to Stony Point because of a "mistake" and that RSHT did not have any other operating room externships available.  Johnson told Smith that she could

instead do her first five-week externship in the central sterile unit at Henrico Doctors Hospital, and that Smith's two other externships would be in an operating room and provide the necessary experience for licensing.

107.    Although the externship in central sterile was not in the operating room – and thus would not count toward the surgical experience that Smith needed for licensing – Smith agreed to accept the central sterile placement.  She agreed because she had such limited experience with surgical instruments due to RSHT's failure to provide adequate instruments in the classroom. Smith felt that the central sterile externship would at least help to compensate.

108.    In January 2010, when it came time for Smith to do her second externship, she discovered that RSHT again did not have a placement for her in an operating room.  Johnson told Smith that she could either complete another five weeks in central sterile at Henrico Doctors Hospital, or she could leave the ST program by going on "academic interruption" and wait for an operating room placement.  Johnson also told Smith that there was a six-month waiting list for ST students to obtain an externship in an operating room and that if she turned down the central sterile placement, she would go to the bottom of the waiting list.  The waiting list was growing because RSHT had continued to admit students into the ST program after Smith started taking classes.  Smith concluded that her chances of ever getting an operating room externship from RSHT were virtually nil and accepted a second placement in central sterile.

109.    RSHT also assigned Smith to central sterile for her third and final externship.  As a result, Smith did not gain any operating room experience through her RSHT externships.

110.    Even though her externships were inadequate, Smith had to rearrange her work schedule to accommodate them because Patterson's representation that the ST program could be

completed in the evenings was false.  This created great hardship for Smith, who was only able to rearrange her work schedule after much effort.

111.    Smith graduated from RSHT in March 2010.  The RSHT curriculum had not prepared her for the surgical technician certification exam, contrary to RSHT's representations to her when she was a prospective student.  She studied for the exam independently using materials she obtained on her own and with extensive tutoring from her fiancé, who is a surgical nurse. Smith took the certification exam on April 9, 2010, and passed because of her independent work. Although RSHT had told Smith that her tuition would cover the cost of the exam, Glover told her in the spring of 2010 that the school would not pay for it.  Smith had to cover the fee for the exam herself, which was almost $200.

112.    Although Smith has passed the written certification exam, she cannot obtain a license as a surgical technician without the requisite 150 surgical cases.  She was supposed to gain this experience during her RSHT externships but did not because RSHT failed to arrange appropriate externships.

113.     Since graduation, Smith has searched all over the Richmond area for a hospital or surgical center to take her as an extern so that she can gain the surgical experience she still needs for her license.  All of the health care facilities she has contacted have turned her down because she is no longer a student covered by insurance and would be a liability in the operating room.

114.    Also since graduation, Smith has applied for twelve surgical technician positions at hospitals and surgical centers in the Richmond area.  She has been denied for all of these positions because of her lack of licensing, lack of experience in an operating room, and/or the poor reputation of RSHT's ST program in the health care community.

115.    Smith's student loans entered repayment in October 2010.  She has had to refinance her loans to lower her monthly payment by extending the repayment period, which increases the interest payments she will have to make before her loans are paid off.  Smith is only able to make the reduced monthly payments with financial help from her fiancé and her family.

116.    Smith spent over $20,000, mostly through debt, for a program that did not remotely provide the education and licensing eligibility promised by RSHT.  Smith reasonably believed RSHT's promises, but RSHT did not make a good faith effort to fulfill them.

117.    Smith's experience as a prospective student and student at RSHT are typical of the experiences of others who have enrolled at RSHT.

**4.    DEFENDANT ENGAGES IN "REVERSE REDLINING" BY TARGETING AFRICAN-AMERICANS AND RESIDENTS OF POORER NEIGHBORHOODS FOR ENROLLMENT AT RSHT**

118.    RSHT targets African Americans for enrollment at RSHT.  It similarly targets poorer neighborhoods of the Richmond area.

119.    The population of the greater Richmond area is 30.1% African-American, but the student body at RSHT is 75% African-American.

120.    This disparity is little changed by considering only the population 25 years old or older whose highest educational attainment is a high school diploma or GED certificate (that is, the part of the population more likely to be interested in for-profit vocational colleges in the area).  Only 33.8% of this part of the population in the greater Richmond area is African-American.

121.    This extreme disparity between the racial makeup of RSHT's students and the population from which those students are drawn is the direct result of Defendant's pattern or

practice of intentionally targeting African Americans and residents of poorer neighborhoods for enrollment at RSHT.

122.    Upon information and belief, RSHT targets African Americans because it believes that African Americans are unsophisticated.  It believes that it can take advantage of and manipulate African Americans into taking out large federal loans without appropriately considering and appreciating the long-term consequences of such debt and the poor quality of RSHT's educational programs.

123.    RSHT targets poorer neighborhoods for comparable reasons and because people with less financial resources are eligible for a broader range of federal financial aid, which is the cornerstone of RSHT's scheme to enrich itself.  RSHT even asks prospective students if they receive food stamp benefits and considers people who answer affirmatively to be more desirable because it indicates likely eligibility for Pell Grants and other means-tested federal financial aid. RSHT's practice of targeting poorer neighborhoods has a disparate impact on African Americans because it leads disproportionately to the enrollment of African Americans at RSHT.

124.    RSHT targets African Americans by intentionally gearing its marketing efforts to channels that disproportionately reach an African-American audience.  This includes, but is not limited to, advertising on the BET (Black Entertainment Television) cable channel and Richmond hip hop radio stations 92.1 FM and 106.5 FM.  RSHT's advertising emphasizes that RSHT is located "on the bus line."  This is a euphemism that RSHT uses intentionally to portray itself as a school for African Americans and to target African-American communities that rely disproportionately on Richmond's public transportation system.  In addition, RSHT's Chester campus targets prospective students in Petersburg, a majority African-American city that is farther away from the school than areas that are not majority African-American.

125.    RSHT targets African Americans and residents of poorer neighborhoods through other marketing techniques.

126.    RSHT's other marketing techniques include but are not limited to distributing flyers, going to job fairs, phoning people on lists of "leads" that the school obtains, going door to door, and conducting open houses.  At the open houses, RSHT tells prospective students that health care is a booming area that is generating many new and good jobs.  Upon information and belief, RSHT also represents at the open houses that attending RSHT will make the prospective students qualified for those jobs.  RSHT also says that it will help the prospective students obtain financial aid to pay for RSHT.  The fundamental message that RSHT seeks to convey at the open houses is that after attending RSHT, people will not have any trouble finding a job.  RSHT markets itself in this manner knowing that its graduates do not do well in finding jobs in their field of study, but the school intentionally withholds this information from prospective students.

127.    RSHT's policy of targeting African Americans and residents of poorer neighborhoods in the Richmond area is the direct reason why 75% of RSHT's students are African-American while the percentage of African Americans in the population from which RSHT's students are drawn is much lower.

128.    By targeting its deceptive and unlawful programs at and in a manner that disparately impacts African Americans, RSHT causes harms that go well beyond the tuition dollars for which its students receive no commensurate benefit.  The student loans that RSHT persuades its students to take out frequently are unmanageable and result in default.  This destroys credit ratings, which is especially harmful in African-American communities because they have traditionally been denied equal access to credit.  This significantly impedes these students' ability to obtain credit and find employment in future years.  RSHT's practices make it

harder for these students to buy a car or a home, or to take out loans for a legitimate education

that will improve their economic opportunities.  Impaired credit also makes it harder to find a job

because employers often obtain credit reports as part of background checks.

## CLASS ALLEGATIONS

129.    Plaintiffs bring this Complaint as a class action pursuant to Fed. R. Civ. P. 23(a),

23(b)(2), and 23(b)(3).

130.    Plaintiffs request that this Court certify a class of all past and present persons who

have been enrolled at RSHT at any time since it opened in 1997.  Plaintiffs are members of the

class they seek to represent.

131.    Plaintiffs also request that this Court certify a subclass of all past and present

African Americans who have been enrolled at RSHT at any time since it opened in 1997

pursuant to Fed. R. Civ. P. 23(c)(5).  Plaintiffs understand and are informed that most members

of the class described in paragraph 130 are also members of this subclass.  Plaintiff Mary

Morgan is a member of the subclass she seeks to represent.

132.    This action is properly maintained as a class action because:

   a)  Joinder of all class members is impracticable because of the size of the class.

       Current RSHT enrollment exceeds 600 students, and Plaintiffs are informed

       and believe that the class includes thousands of students because the class

       period covers approximately 14 years.

   b)  Defendant has acted or refused to act on grounds generally applicable to the

       class.

   c)  The claims alleged on behalf of the class and subclass raise questions of law

       and fact that are common to the class and subclass and predominate over

questions affecting only individual members because all class members enrolled in the same school on the basis of the same or similar representations, entered into the same or similar written contracts with Defendant Richmond School of Health and Technology, Inc., and received the same quality of education.  Common questions of law and fact include, among others:  (i) whether Defendant intentionally targeted African Americans or whether their policies and practices have a disparate impact on African Americans in violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*; (ii) whether any disparate impact is justified by business necessity; (iii) whether Defendant committed fraudulent acts or practices in violation of the Virginia Consumer Protection Act, Va. Code Ann. § 59.1-196 *et seq.*; (iv) whether Defendant Richmond School of Health and Technology, Inc. breached its contractual obligations to the class members; (v) whether Defendant fraudulently induced class members to enroll at RSHT by knowingly making false misrepresentations; and (vi) whether class members are entitled to an injunction requiring RSHT to pay off the balance of their student loans.

d)   The claims of the class representatives are typical of the class because the class representatives enrolled in the same school as the other class members on the basis of the same or similar representations, entered into the same or similar written contracts with Defendant Richmond School of Health and Technology, Inc. as the other class members, and received the same quality of education as the other class members.

   e)   A class action is superior to other available methods for fairly and efficiently

          adjudicating this litigation.

133.    The class representatives and class counsel will fairly and adequately represent

the interests of the class.  The class representatives have no interests that are antagonistic to the

interests of other Plaintiffs and class counsel have years of experience in civil rights, consumer,

and class action litigation.

**INJURY TO NAMED PLAINTIFFS**

134.    Plaintiffs Mary Morgan and Amanda Smith have suffered and continue to suffer

financial injuries as a direct, foreseeable, and proximate result of Defendant's past and ongoing

actions set forth above.  Plaintiffs have paid large sums of money to attend RSHT, mostly by

taking out large student loans.  In the absence of Defendant's actions, Plaintiffs would not have

paid this money and taken out these loans and/or would have gained from RSHT the necessary

skills, knowledge, and experience to obtain gainful employment in their field of study allowing

them to earn the income needed to manage their student loans.

135.    As a direct, foreseeable, and proximate result of Defendant's actions, Plaintiffs

have suffered additional financial injuries because they have lost past wages.  Plaintiffs have

devoted significant time to attend and study for classes at RSHT.  In the absence of Defendant's

actions, Plaintiffs would otherwise have devoted that time to working at paying jobs.

136.    As a direct, foreseeable, and proximate result of Defendant's actions, Plaintiffs

have suffered additional financial injuries because they will lose future wages.  In the absence of

Defendant's actions, Plaintiffs would have received an education that enhanced their future

earning capacity by allowing them to work in jobs in their field of study.

137.     As a direct, foreseeable, and proximate result of Defendant's actions, Plaintiffs have suffered, and in the future will continue to suffer, humiliation, embarrassment, and mental and emotional distress.

138.     In causing injury to Plaintiffs, Defendant acted intentionally, maliciously, and with willful, callous, wanton, and reckless disregard for Plaintiffs' rights.

139.     Without relief, Plaintiffs are also likely to be injured by damaged credit. Repayment of federal student loans must begin soon after graduation, and Plaintiffs are now required, or are about to be required, to make monthly payments that they cannot afford.  If they default on their student loans it will substantially impair their ability to get credit in the future.  It will also substantially impair their ability to find new employment because credit reports are often used by employers as part of background checks.

## CAUSES OF ACTION

### Count I – Violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*

140.     Plaintiff Mary Morgan realleges and incorporates by reference all of the allegations set forth in paragraphs 1 through 139 above.

141.     Defendant is a "creditor" within the meaning of 15 U.S.C. § 1691a(e).

142.     Plaintiffs have been "applicants" within the meaning of 15 U.S.C. § 1691a(b) when they have applied for an extension, renewal, or continuation of student loans.

143.     Defendant's acts, policies, and practices are intentionally discriminatory against African Americans with respect to aspects of credit transactions, constitute reverse redlining, and violate 15 U.S.C. § 1691(a)(1).

144.     Defendant's acts, policies, and practices disparately impact African Americans with respect to aspects of credit transactions in violation of 15 U.S.C. § 1691(a)(1).

## Count II – Violation of the Virginia Consumer Protection Act, Va. Code Ann. § 59.1-196 *et seq.*

145.    Plaintiffs Mary Morgan and Amanda Smith reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 144 above.

146.    Plaintiffs' enrollment at RSHT to receive educational services constitutes a "consumer transaction" within the meaning of Va. Code Ann. § 59.1-198.

147.    Defendant committed fraudulent acts or practices with respect to Plaintiffs' enrollment at RSHT in violation of Va. Code Ann. § 59.1-200(A), including subsections (5), (6), and (14).

## Count III – Breach of Contract

148.    Plaintiffs Mary Morgan and Amanda Smith reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 147 above.

149.    Each Plaintiff entered into a written contract (*i.e.*, the Enrollment Agreement) with Defendant Richmond School of Health and Technology, Inc.

150.    Each contract contained an implied covenant of good faith and fair dealing.

151.    Defendant Richmond School of Health and Technology, Inc. violated the implied covenant of good faith and fair dealing by exercising its contractual discretion in bad faith and failing to provide Plaintiffs with an education adequate to prepare them for gainful employment in their field of study.

## Count IV – Fraudulent Inducement to Contract

152.    Plaintiffs Mary Morgan and Amanda Smith reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 151 above.

153.    Defendant, to induce Plaintiffs to enter contracts with Defendant Richmond School of Health and Technology, Inc., made positive statements of fact regarding the quality

and content of the education provided by RSHT that were false, material to the contract, and relied upon by Plaintiffs in deciding to enroll at RSHT.

154.    Defendant knew that its statements regarding the quality and content of the education provided by RSHT were false at the time they were made and did not intend that RSHT would satisfy the statements at the time they were made.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that the Court grant it the following relief:

(1)    Enter a declaratory judgment that the foregoing acts, policies, and practices of Defendant violate the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*; violate the Virginia Consumer Protection Act, Va. Code Ann. § 59.1-196 *et seq.*; constitute breach of contract; and constitute fraudulent inducement to contract;

(2)    Enter an injunction enjoining Defendant and its directors, officers, agents and employees from engaging in the conduct described herein and directing Defendant and its directors, officers, agents and employees to take all affirmative steps necessary to remedy the effects of the conduct described herein and to prevent additional instances of such conduct or similar conduct from occurring in the future, including but not limited to requiring Defendant to pay off the balance of Plaintiffs' student loans;

(3)    Award compensatory damages to Plaintiffs in an amount to be determined by the jury that would fully compensate Plaintiffs for their injuries caused by the conduct of Defendant alleged herein, including but not limited to the compensation for the funds Plaintiffs have paid out-of-pocket for tuition at RSHT;

(4)    Award treble damages to Plaintiffs pursuant to Va. Code Ann. § 59.1-204(A) for Defendant's willful violation of the Virginia Consumer Protection Act;

39

(5)      Award punitive damages to Plaintiffs in an amount to be determined by the jury

that would punish Defendant for the willful, wanton and reckless conduct alleged herein and that

would effectively deter similar conduct in the future;

(6)      Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 15 U.S.C. §

1691e(d) and Va. Code Ann. § 59.1-204(B);

(7)      Award prejudgment interest to Plaintiffs; and

(8)      Order such other relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs request trial by jury as to all issues in this case.


Respectfully submitted,


John P. Relman (D.C. Bar No. 405500)
Glenn Schlactus (D.C. Bar No. 475950)
RELMAN, DANE & COLFAX PLLC
1225 19th Street, N.W.
Suite 600
Washington, D.C. 20036
(202) 728-1888
(202) 728-0848 (fax)

*Attorneys for Plaintiffs*

Dated:  June 8, 2011